# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 8, 2010

No. 09-60263
Summary Calendar

Lyle W. Cayce
Clerk

STARTRAN, INC.

Petitioner

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION;
HILDA L. SOLIS, SECRETARY, DEPARTMENT OF LABOR

Respondents

On Petition for Review of a Final Order of the
Occupational Safety and Health Commission

Before GARWOOD, GARZA and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge.

StarTran, Inc., challenging its Five Hundred Dollar fine for its 2002 violation of regulations under the Occupational Safety and Health Act of 1970 (OSHA or the Act), 29 U.S.C. §§ 651-678, appeals the determination by the Occupational Safety and Health Commission (the Commission) that StarTran is not exempt from the Act under the provision of 29 U.S.C. § 652(5) stating that for purposes of the Act "'employer' . . . does not include . . . any . . . political subdivision of a State." On StarTran's previous appeal from the Commission's September 27, 2006 decision rejecting StarTran's said claim (and affirming the decision of the Commission Administrative Law Judge following an evidentiary

No. 09-60263

hearing), we remanded to the Commission for reconsideration. *StarTran, Inc. v. Occupational Safety and Health Commission*, 290 Fed. Appx. 656 (5th Cir. 2008) (*StarTran I*). The Commission thereafter remanded the case to the Commission Administrative Law Judge (ALJ). The ALJ subsequently issued his ruling (without taking any further evidence) holding that StarTran was not exempt as a political subdivision under section 652(5). Although StarTran petitioned the commission for discretionary review of that decision, the commission did not direct review. Thus the ALJ's decision on remand became the final order of the Commission under 29 U.S.C. § 661(j). StarTran has timely petitioned this court for review under 29 U.S.C. § 660(a).

## CONTEXT FACTS AND LEGAL BACKGROUND

The words "political subdivision" appearing in section 652(5) are not defined in the Act. Similarly, the National Labor Relations Act (NLRA), which likewise covers "employers" and provides that "the term 'employer'" shall not include "any State or political subdivision thereof," 29 U.S.C. § 152(2), contains no definition of "political subdivision." In *N.L.R.B. v. Natural Gas Util. Dist. of Hawkins County, Tenn.*, 81 S.Ct. 1746 (1971), the Supreme Court considered whether the NLRB had correctly held that the utility district was *not* a "political subdivision" so as to be exempt from the NLRA under section 152(2). The Court noted that

> ". . . the Board . . . 'has limited the exemption for political subdivisions to entities that are either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate.'"

2

No. 09-60263

*Id*. at 1749.[1]  In holding that the NLRB had erred "in determining in light of the Board's own test" that utility district was *not* a political subdivision, *id*. at 1749-50, the Court went on to say:

> "The Board found that 'the Employer in this case is neither created directly by the State, nor administered by State-appointed or elected officials.'  167 N.L.R.B., at 691-692 (footnotes omitted).  But the Board test is not whether the entity is administered by 'State-appointed or elected officials.'  Rather, alternative (2) of the test is whether the entity is 'administered *by individuals who are responsible to public officials* or to the general electorate' (emphasis added), and the Tennessee statute makes crystal clear that respondent [the district] is administered by a Board of Commissioners appointed by an elected county judge, and subject to removal proceedings at the instance of the Governor, the county prosecutor, or private citizens."

*Id*. at 1750.[2]

About seven months after the Supreme Court's decision in the *Hawkins County* case, the Secretary of Labor promulgated 29 C.F.R. § 1975.5, a new regulation interpreting, for the first time, the political subdivision exemption of section 652(2).  37 Fed. Reg., No. 14, at 630-31, January 21, 1972.  That regulation has not since been amended.  As the Secretary's brief herein correctly states:

> "The regulation sets out the following two tests for a state political subdivision, which ask whether the entity 'has been (1) created directly by the State so as to constitute a department or administrative arm of the state government; or (2) administered by

---

[1] The Court expressly noted that it did not decide whether *other* entities than those listed in these two alternatives might also be entitled to the political subdivision exemption. *Id*. at 1749.

[2] In subsequent paragraphs of the opinion the Court went on to also point out that the utility district had many diverse governmental type powers, including the power of eminent domain as against other governmental entities and subpoena powers.  *Id*. at 1750-51.

No. 09-60263

individuals who are controlled by public officials and responsible to such officials or to the general electorate.  29 U.S.C. § 1975.5(b)."[3]

---

[3] The regulation goes on to state in its next subsections:

"(c) *Factors for meeting the tests*.  Various factors will be taken into consideration in determining whether an entity meets the test discussed above. Some examples of these factors are:

[1] Are the individuals who administer the entity appointed by a public official or elected by the general electorate?

[2] What are the terms and conditions of the appointment?

[3] Who may dismiss such individuals and under what procedures?

[4] What is the financial source of the salary of these individuals?

[5] Does the entity earn a profit?  are such profits treated as revenue?

[6] How are the entity's functions financed?  What are the powers of the entity and are they usually characteristic of a government rather than a private instrumentality like the power of eminent domain?

[7] How is the entity regarded under State and local law as well as under other Federal laws?

[8] Is the entity exempted from State and local tax laws?

[9] Are the entity's bonds, if any, tax-exempt?  As to the entity's employees, are they regarded like employees of other State and political subdivisions?

[10] What is the financial source of the employee-payroll?

[11] How do employee fringe benefits, rights, obligations, and restrictions of the entity's employees compare to those of the employees of other State and local departments and agencies?

In evaluating these factors, due regard will be given to whether any occupational safety and health program exists to protect the entity's employees."  [§ 1975.5(c); bracketed numbers inserted.]

The regulation's next subdivision states that "[t]he above list of factors is not exhaustive and no particular factor, isolated from the particular facts of a case, is assigned any particular weight. . . . Each case must be viewed on its merits; and whether a single factor will be decisive, or whether the factors must be viewed . . . as part of a sum total, also depends on the merits of each case." [§ 1975.5(d)].

The next subdivision [§ 1975.5(e)(1)] lists examples of "types of entities which would normally be regarded as not being" covered employers, including "the State Department of Labor and industry; . . . . State, county, and municipal public school boards and commissions; and public libraries."

Section 1975.5(e)(2) lists examples of types of entities that, "[d]epending on the facts in the particular situation . . . would probably be excluded as employers under" the Act, including "irrigation districts, . . . ; *municipal transit entities*; and State, county and local hospitals and related institutions."  (emphasis added).

Finally, § 1975.5(e)(3) lists "examples . . . of entities which would not normally be regarded as a 'State or political subdivision of a State, but unusual factors to the contrary may indicate otherwise."  These are listed as follows:

"Public utility companies, merely regulated by State or local bodies; business, such as alcoholic beverage distributors, licensed under State or local law; other business entities which under agreement perform certain functions for the

4

No. 09-60263

The Secretary and StarTran treat the foregoing two alternative tests as being essentially the same as the above quoted test set out in the *Hawkins County* case, 81 S.Ct. at 1749, for the NLRA political subdivision exemption (§ 152(2)). In what appears to be the first reported judicial decision construing the section 1975.5, the Seventh Circuit in *Brock v. Chicago Zoological Soc.*, 820 F.2d 909 (7th Cir. 1987), stated:

> "The Secretary of Labor's regulations set forth a two-part test for determining whether an entity is a state or political subdivision. Under this test, any entity that is '(1) created directly by the State, so as to constitute a department or administrative arm of the government, or (2) administered by individuals who are controlled by public officials and responsible to such officials or to the general public' will be deemed to be a state or political subdivision under § 625(5). 29 C.F.R. § 1975.5(b). This test is identical to the formula the National Labor Relations Board has long used to determine whether an entity is a political subdivision exempt from the Board's jurisdiction under 29 U.S.C. § 152(2)." *Id.* at 910 (citing *Hawkins County*).[4]

StarTran's claim of exemption as a "political subdivision" relies on the second alternative test of section 1975.5(b) – namely that it is "administered by individuals who are controlled by public officials and responsible to such officials or to the general electorate" – is grounded on its relationship to Capital Metropolitan Transit (Capital Metro) in Austin, Texas.

Capital Metro was established in 1985 under Texas law (then TEX. REV. CIV. STAT. art. 1118x). It assumed the assets of the former City of Austin

State, such as gasoline stations conducting automobile inspections for the State and county governments."

[4] In the interests of accuracy, we note that there are some minor differences in wording between the NLRB tests and those under § 1975.5(b). As to the second of the alternative tests (the only one at issue here) the NLRB test is "administered by individuals who are responsible to public officials or to the general electorate," while in § 1975.5(b) "general public" replaces "general electorate" and "controlled by public officials and" appear between "are" and "responsible." No party (nor any authority we are aware of) has suggested that this difference is in any way material, either generally or in the present context.

5

Transit System.   Capital Metro operates under Chapter 451 of the Texas Transportation Code.  *See* Tex. Transportation Code § 451.052(a)(1), and "is a public political entity and corporate body" that "exercises public and essential governmental functions."   Its board of directors is responsible for its management, operations and control, and employs a general manager or chief executive officer administering its daily operations (see *id*. §§ 451.053, 451.101, 451.106).  The undisputed and unchallenged evidence is that Capital Metro's board of directors consists of seven members, five of whom are elected public officials.  It is indisputably a political subdivision of the State of Texas, and its officers and directors are indisputably public officials.

Prior to the creation of StarTran and its contract with Capital Metro effective January 1, 1992, Capital Metro (and before it, the City of Austin) contracted with Management Labor Services (MLS), an outside contractor, for labor (and possible other) services for operation of the Austin Transit System. With the 1991 ending of Capital Metro's relationship with MLS (the reasons for which are not reflected in the record), in order to continue to be eligible for federal financial assistance of certain kinds provided under the Federal Transit Act it was apparently necessary, *inter alia*, to preserve the collective bargaining rights of the MLS employees (covered by the then collective bargaining agreement between MLS and Amalgamated Transit Union Local 1091) who had been servicing the Capital Metro operations.  *See* 49 U.S.C. § 5333(b).[5] However,

---

[5] 49 U.S.C. § 5333)b provides in part:

"**(b) Employee protective arrangements.-(1)** As a condition of financial assistance under sections 5307-5312, 5316, 5318, 5323(a)(1), 5323(b), 5323(d), 5328, 5337, and 5338(b) of this title, the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable.  The agreement granting the assistance under sections 5307-5312, 5316, 5318, 5323(a)(1), 5323(b), 5323(d), 5328, 5337, and 5338(b) shall specify the arrangements.

**(2)** Arrangements under this subsection shall include provisions that may be

No. 09-60263

Capital Metro, as a political subdivision of the State of Texas, is prohibited by Texas law from entering into a collective bargaining agreement with a labor union or recognizing a union as the bargaining agent for its employees. *See* Texas Government Code § 617.002.[6] In an effort to qualify for federal financial assistance under the Federal Transit Act, while not violating those prohibitions of Texas law, Capital Metro, by resolution of its board of directors in November 1991 formed StarTran as a nonprofit corporation under the Texas NonProfit Corporation Act (Art. 1396-1.011-11.01, TEX. REV. CIV. STATS.), on December 6, 1991.

---

necessary for –
    **(A)** the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;
    **(B)** the continuation of collective bargaining rights;
    **(C)** the protection of individual employees against a worsening of their positions related to employment;
    . . . ."

[6] Texas Government Code § 617.002 provides:
"**§ 617.002.  Collective Bargaining by Public Employees Prohibited**

(a) An official of the state or of a political subdivision of the state may not enter into a collective bargaining contract with a labor organization regarding wages, hours, or conditions of employment of public employees.

(b) A contract entered into in violation of Subsection (a) is void.

(c) an official of the state or of a political subdivision of the state may not recognized a labor organization as the bargaining agent for a group of public employees."

We also note that 29 C.F.R. § 215.3(a)(2) provides in part:

"In instances where states or political subdivisions are subject to legal restrictions on bargaining with employee organizations, the Department of Labor will utilize special procedures to satisfy the Federal statute in a manner which does not contravene state or local law."

7

No. 09-60263

Thereafter, on December 31, 1991, effective January 1, 1992, StarTran and Capital Metro entered into a contract by which StarTran generally agreed to employ and provide to Capital Metro the services of drivers and mechanics and others in Capital Metro's mass transit operations and agreed "to be bound by the terms and conditions of the existing collective agreements with Unions."[7]  The December 31, 1991 capital Metro-StarTran contract recites that:

> "WHEREAS, to ensure compliance with both state and federal law, it is necessary for Capital Metro to obtain certain services from an independent entity which can recognize the collective bargaining rights of those persons who provide Mass Transit Service for Capital Metro; . . ."[8]

The contract between Capital Metro and StarTran, as amended in 1997, rewrites the original contract's article II "status of StarTran" to add, among other things, a provision, that:

> "Capital Metro shall have no right to supervise or control the duties and activities of StarTran so as to cause a violation of the provisions of Chapter 617 of the Texas Government Code or 49 U.S.C. Section 5333.  It is the intent of the parties that, for purposes of Collective Bargaining, StarTran is an independent corporate entity which shall in no way be deemed to be an affiliate, partner, subsidiary, joint venturer, or otherwise under the control of Capital Metro."

The testimony of the president of the local union representing the StarTran bus drivers and mechanics, called as a witness by the Secretary, was that Capital

---

[7] And, StarTran did enter into a contract with MLS by which StarTran assumed all the rights, duties and responsibilities of the employer under the MLS's relevant collective bargaining contract with the union.

[8] The employees covered by the collective bargaining agreement between StarTran and the union are Startran's:
> "Transportation and maintenance employees, as defined by the national Labor Relations Board . . . [but] do[] not include any office clerical employees, guards, and supervisors as defined in the National Labor Relations Act . . . [or] any employee . . . designated by the Employer as a confidential or managerial employee, who meets the definition under NLRA . . . [and normally performs such duties]."

8

Metro "had to approve" any proposed collective bargaining agreement. There was no evidence contrary to this testimony or to the witness's assertion that Capital Metro had never refused such approval. The union president likewise testified that he had "discussed many personnel and collective bargaining issues [of concern to him as union president] with Mr. Gilliam [the general manager of Capital Metro] or his predecessor at Capital Metro," and that in the last three years he had had "several meetings with Mr. Gilliam and also the board of directions [of Capital Metro] relating to the issues we've had to deal with." He further explained "[w]hen we can't get something done by working at StarTran, we go on to the next step or we'll go to Mr. Gilliam. And then if we can't get it done there, we'll go to the [Capital Metro] board and we go public." Again, this testimony was not controverted.[9]

There is no evidence of any ruling – formal or informal – by any official or agency under the NLRA, or by any court, that StarTran is (or is not) an employer covered by the NLRA or is (or is not) a "political subdivision" under section 152(2). However, StarTran does not, and apparently has never, taken the position that it is not covered by the NLRA. There does not appear to be any ruling by any Texas court or agency, or by the Texas Attorney General, respecting whether or not StarTran is a "political subdivision of the state" of Texas within the meaning of section 617.002 of the Texas Government Code (see note 6, *supra*). StarTran has claimed it is entitled to governmental immunity under the Texas Tort Claims Act (*see* TEX. CIV. PRAC. & REM. CODE, Ch. 101, § 101.101(3)(B) and apparently one or two trial courts have agreed   (in

---

[9] Similarly, the StarTran board member and director of transportation testified without contradiction that "there are times when the union has bypassed StarTran personnel and taken stuff directly to Mr. Gilliam [president and general manager of Capital Metro]." The StarTran president, manager of labor relations and board member testified that there were instances when union representatives "[t]alked to me and not found the answer that they want and so they've gone to Mr. Gilliam."

unpublished orders); and it is insured through the Texas Municipal League Intergovernmental Risk Pool, which insures only governmental entities.

As amended in 1993 the Capital Metro-StarTran agreement provided that StarTran would "[p]rovide safety and other training" (the original agreement included "safety and other training" among the matters to be provided by Capital Metro).  The undisputed evidence is that an employee of Capital Metro, its safety director who reported to Capital Metro's risk manager (also a Capital Metro employee), established and from time to time amended the safety program and the safety training program which were applicable and applied to StarTran and Capital Metro and their employees, and conducted and supervised training exercises thereunder.  However, discipline of bargaining unit employees for safety violations, or otherwise, was handled by StarTran and the union under the collective bargaining agreement.  The evidence also established that StarTran and Capital Metro are both subject to (and in compliance with) the Federal Transit Administration requirement to have a safety program which that agency reviews every three years, as well as to state law safety program requirements.

The Capital Metro-StarTran agreement has always contained the provision that the "services [to be] provided by Capital Metro shall be ministerial only, and that StarTran shall retain absolute and real day-to-day control over all matters relating to the terms and conditions of employment, supervision, and control of its employees."  The undisputed evidence is that at all times Capital Metro has furnished all the buses (which are all marked as being Capital metro buses; the drivers wear "StarTran" or "StarTran in Service to Capital Metro" uniform shirts), and other equipment, facilities and office space, and has determined the fares, routes and schedules for the bus service, as well as furnished all insurance and all clerical, budgeting and accounting services, and all funds to StarTran.  StarTran has *no* source of funds or revenue other than

No. 09-60263

Capital Metro. Any StarTran expenditure must be approved by Capital Metro. StarTran has at no time had *any assets* other than its employees.[10]

The Capital Metro-StarTran contract has never had any fixed term and has always been expressly terminable by either party "giving 180 days written notice of its intent to do so."

StarTran does not have, and has never had, any business relationship with any other party other than Capital Metro (or the union) and does not, and has never, furnished employees or services to any entity other than Capital Metro. It does not and could not exist or function apart from its relationship with Capital Metro.

The StarTran board of directors consists of the five persons who hold specified executive positions with StarTran (director of transportation, superintendent of maintenance, director of maintenance, director of special transit services, and manager of labor relations). The persons holding those positions are each StarTran employees who are selected by the president and general manager of Capital Metro (Fred Gilliam, elected to that position by the Capital Metro board). If and when any such StarTran employee ceases to hold such specified StarTran executive position, he or she ceases to be a member of the StarTran board of directors, and his or her successor in that executive position assumes that place on the StarTran board. The president of Capital Metro hires these StarTran executives, fixes their compensation (which is funded by Capital Metro) and has the power to transfer them to other StarTran positions (and hence to remove them from the StarTran board) and to appoint another StarTran employee to that specified executive position (and hence to

---

[10] Other than its executives and board members, StarTran's only employees, apart from those covered by the collective bargaining agreement (which excludes office clerical, guards, supervisors and managerial employees, see note 8 *supra*), are two or three employees in its labor relations department.

11

No. 09-60263

that place on the StarTran board).  Those StarTran executives are at will employees who may be terminated by the president of Capital Metro.  All this is according to the by-laws of StarTran, as testified to without objection by its president and manager of labor relations, Ken McCulloch (who had the StarTran by-laws with him while testifying) and is unquestioned.[11]  Further, McCulloch testified that Gilliam, as CEO of Capital Metro, is his (McCulloch's) "boss as president and labor relations manager of StarTran."  Similarly, Dan Peabody, StarTran board member and director of transportation, testified that his "boss as director of transportation" is "Fred Gilliam," the CEO of Capital Metro.  Peabody, as StarTran director of transportation, and Steve Herrera, the StarTran director of maintenance, each have "scheduled biweekly meetings" with Gilliam, Capital Metro CEO, as transportation and maintenance are "the two largest components of StarTran."  Peabody further testified:

> "And then on a monthly basis Mr. Gilliam meets with the StarTran board of directors.  And then for me, I usually have a phone conversation with Mr. Gilliam on a daily basis or I have scheduled meetings with him to where I bring him up to speed on some of the things that we're doing.
>
> Q.    Again, he is your boss; is that correct?

---

[11] The Secretary's briefs before the Commission, and before this court, in the prior appeal, state, respectively:

> "StarTran's board of directors is composed of five persons who are members of the board by virtue of the fact that they occupy certain specified positions at StarTran, including but not limited to, Ken McCulloch, the president and labor relations manager, and Dan Peabody, the director of transportation (record citations).  Persons are appointed to these positions as employees of StarTran and may be removed by the CEO of Capital Metro." *Ibid.* (Commission response brief at 4).
>
> . . .
>
> StarTran's board of directors is composed of five members, all appointed and removable by the chief executive officer of Capital Metro, five of whose seven board members are publicly elected."  (Court brief at 18).

12

No. 09-60263

A.    That's correct.  he works on developing my PMP, which is your evaluation system, through which we receive our raises on an annual basis."

Peabody specifically testified that McCulloch (StarTran president and director of labor relations) was *not* his "boss" and that he did *not* "report to Mr. McCulloch at all."  Finally, Peabody explained that when an ice storm hit the area he made recommendations to Gilliam, and Gilliam made the final decision, as to what levels of bus service, if any, would be provided throughout that day.

DISCUSSION

In our prior opinion we vacated the Commission's decision and remanded for reconsideration because the Commission had failed to properly acknowledge the actual "evidence regarding control of StarTran's board."  We also noted that the Secretary [in her brief] "does not appear to find the commission's public control factor significant or determinative" and that "the Secretary [in her brief] emphasizes StarTran's day to day control of its employees instead of Capital Metro's control of StarTran's board."  We stated that "[b]ecause the Commission and the Secretary appear to set forth somewhat different interpretations of the regulation at issue [section 1975.5], on remand the Commission should defer to the Secretary's interpretation, to the extent that it is reasonable. . . . ," citing *Martin v. Occupational Safety and Health Review Commission*, 111 S.Ct. 1171, 1176 (1991).

On remand, the ALJ's decision – which became the decision of the Commission – that StarTran was not a political subdivision under section 1975.5 basically rested on the ALJ's determination, based on the original hearing record, "that Capital Metro might ultimately have the authority to dismiss a member of StarTran's board or its president does not nullify the fact that it is StarTran that controls the day to day working conditions of its employees" and that "those factors that relate to the day-to-day control of employees, including

13

employee health and safety[,] demonstrate that such controls [sic] lies almost exclusively with StarTran.  Therefore, for purposes of the Act, StarTran is not a political subdivision of the State of Texas."

The undisputed evidence is that StarTran's entire board of directors, and each of its executives, all of whom are at will employees, are appointed and subject to removal by Capital Metro's board of directors and/or its CEO (who are public officials), acting in their sole discretion and without any requirement of cause, their compensation is fixed by Capital Metro's CEO (who may terminate or transfer them at will) and is wholly funded by Capital Metro, and the StarTran executives heading its departments report to the Capital Metro CEO (not to the StarTran president) and regard him as their "boss."  Under any reasonable reading of the language of section 1975(b)(2), one can only conclude that StarTran is "administered by individuals who are controlled by public officials and responsible to such officials," as stated therein.[12]

The Secretary contends that the decisions in *Brock v. Chicago Zoological Society*, 820 F.2d 909 (7th Cir. 1987), and *Tricil Resources v. Brock*, 842 F.2d 141 (6th Cir. 1988), the only reported circuit court decisions addressing section

---

[12] Respecting the "factors" listed in § 1975.5(c), we also note that StarTran, a Texas nonprofit corporation, earns no profit; all its functions and payroll are *entirely* financed by capital Metro (and it has no other revenue); it pays no state, local or federal taxes; it issues no bonds (or other debt instruments); it performs a major portion of the "public and essential governmental functions" that Capital Metro is to perform, Tex. Transportation Code § 451.052(a)(3), and is in some respects regarded as a governmental entity, but it has no governmental type powers such as eminent domain; its employees are not state employees but enjoy many of the same benefits as Capital Metro employees (who are not state employees either) and are covered by an ERISA retirement plan sponsored by Capital Metro so as to be a "government plan;" it regards itself as not bing a political subdivision for purposes of NLRA collective bargaining; it has a safety training program applicable both to it and Capital Metro promulgated and applied by Capital metro (except as to discipline of bargaining unit employees), and it is subject to Federal Transit Authority safety program requirements.  It is clear that the § 1975.5(c) "factors" overall – and particularly those that actually relate to whether *in fact* an entity is administered by individual controlled by public officials and responsible to such officials – weigh overwhelmingly in favor of StarTran meeting the second alternative "test" of § 1975.5(b).

No. 09-60263

1975.5, support the decision on remand. In *Chicago Zoological Society*, the issue was whether the Society, a private, nonprofit corporation created in 1921, came within the second alternative test under section 1975.5(b)(2) by reason of its relationship with the local Illinois forest preserve district (the District), a local governmental entity, by reason of the Society's 1926 contract with the District under which the Society was given the "entire control and management of the Zoo," located on land owned by the District. In holding that the Society was not a political subdivision under section 1975.5(b)(2), the Court noted that under the Society's charter and by-laws it is managed by its thirty-five person board of trustees, of whom only one is a public official (the president of the District's board). The Society's board of trustees is elected by its 240 governing members, of whom only four are public officials. *Id*. at 912. The Court went on to say:

> "The [Society's board of] trustees . . . [is] responsible for developing zoo policies and electing officers, including the president, who oversees the day-to-day operations of the zoo. *The District has no appointment and removal power* and no direct role in the zoo's operation and maintenance.
>
> The Society's private, nonprofit corporate structure *effectively* insulates its officers from District control over *management decisions*. The officers, who handle the zoo's day-to-day operations, owe their positions to the trustees and, indirectly, to the governing members. Among these latter two groups the District enjoys only nominal representation. Over 97% of the trustees and over 98% of the governing members are private citizens unbeholden to the District or any other state agency. Considering in addition that the *District possesses no power to appoint or remove the Society's managerial officers*, *those officers* clearly do not owe the sort of 'direct personal accountability to public officials or to the general public' that would *entitle* the Society to a political subdivision exemption." *Id*., at 912 (emphasis added).

The present case is the polar opposite of *Chicago Zoological Society*. Moreover, the foregoing language from that opinion is clear that what is relevant for purposes of the section 1975.5(b)(2) alternative test is whether a governmental

15

entity (Capital Metro) and/or public officer (Capital Metro CEO) has the power to appoint and remove the board and/or the "managerial officers" of the putative political subdivision (StarTran).[13]

The Sixth Circuit's decision in *Tricil Resource, Inc.* followed and relied on the Seventh Circuit's decision in *Chicago Zoological Society*. In *Tricil* the issue was whether Tricil Resources Inc. (Tricil) fell within the political subdivision test under section 1975.5(b)(2). The Sixth Circuit held it did not. Tricil was "a private for profit corporation" which, under contract with the City, for some three and a half years, ran the daily operations of the City owned plant which converted garbage to energy sold by the City. Under the contract, the city paid Tricil an annual minimum fee, and reimbursed it all costs and expenses it incurred while managing the plant, and also would pay Tricil a bonus if the net plant operating income exceeded what had been projected. During the three and a half years Tricil managed the plant "it received more than $19 million in operating fees." *Id.* at 141-42. The contract required Tricil to "maintain safety logs to comply with the Occupational Safety and Health Act" and to employ sufficient qualified operating personnel to accomplish its duties under the contract. Tricil "hired all . . . [plant] employees, determined their pay and issued their paychecks," and covered them under its employee benefit plans; it "paid state, local and federal income taxes" (as well as social security taxes for its

---

[13] The *Chicago Zoological Society* opinion notes that the District supplies 50-60% of the Society's revenues [100% would be comparable to what capital Metro furnishes StarTran], the Zoo sits on District land and uses District vehicles and the District "maintains a significant amount of control over the Society's budget" [total control in the case of Capital Metro over StarTran]. *Id.* at 911. However, these factors did not suffice of themselves to overcome the fact that neither the Society's board nor its "managerial officers" were subject to appointment or removal by the District and hence flunked the test of § 1975.5(b).(2). "Absent direct evidence of control we are unwilling to infer that the Society's reliance on public funding has stripped it of its private nature." *Id.* at 913. Here, by contrast, there is direct, unquestioned, evidence of Capital Metro control, and the reliance on Capital Metro funding is virtually total.

employees). *Id.* It is obvious that the City did not create Tricil, was not a Tricil stockholder, and had no power to appoint or remove any member of Tricil's board of directors or any of its executive officers (or "managerial officers"). Nothing in the opinion remotely suggests otherwise. In *that* context, the court held that "the substantial fiscal control the City exercised over . . . [the plant's] operation," *id.* at 143 (together with other miscellaneous factors such as Tricil's use of the City sales tax exemption number to purchase plant materials and supplies, and its lack of eminent domain power) did not alone suffice to bring Tricil within the political subdivision exemption under section 1975.5(b)(2) when none of its board of directors or executive officers were selected or removable by the City (or other public official or authority). Again, *Tricil Resources Inc.* is the polar opposite of the present case.

*No case* under section 1975.5(b)(2) has been cited to us in which the political subdivision exception thereunder has been denied where a majority (here all) of the board of directors and the managerial officers of the assertedly exempt political subdivision, were selected or removable by public officials (here they are both). This is likewise true of cases construing the analogous NLRA exemption under 29 U.S.C. § 152(a).[14]

The cases in this area have generally held that if a majority of the board of directors of the claimed political subdivision is *not* subject to selection or removal by public officials or the general electorate, then the entity *for that reason* fails the second alternative test for being a political subdivision under section 152(2). Thus, in *Jefferson County Community Center v. NLRB*, 732 F.2d 122 (10th Cir. 1984) (overruled in other respects, *Aramack Corp. v. NLRB*, 179

---

[14] As stated in the *Chicago Zoological Society* opinion, the tests are virtually "identical" and "cases construing the comparable provision of § 152(2) offer authoritative guidance." *Id.* at 910.

No. 09-60263

F.3d 872, 874 ns. 2 & 3 (10th Cir. 1999),  the Court held that the Center was not

exempt as a political subdivision under section 152.2, stating:

> "The record . . . demonstrates that although seven directors are
> appointed by public agencies under the Center's by-laws, a majority
> of the Board is neither appointed by nor subject to removal by public
> officials or the general electorate and has no official connection to
> any governmental body.  Under these circumstances, the Center is
> not administered by individuals who are accountable to public
> officials or the general electorate. *Cf. Truman medical Center, Inc.*,
> [641 F.2d 750, 8th Cir. 1981)] 641 F.2d at 573 (medical center held
> not political subdivision where 31 of 49 directors neither appointed
> by nor subject to removal by public officials or general public)."

Similarly, in *NLRB v. Natchez Trace Power Ass'n*, 476 F.2d 1042 (5th Cir. 1973),

we held that the association was not a political subdivision under section 152(2),

stating that:

> ". . . it was organized by private citizens acting pursuant to the
> appropriate enabling statute, and in this respect its formation was
> no different from that of any private corporation organized under
> Mississippi law.
> . . .
>     The directors . . . are initially those named by the citizens
> filing the certificate of incorporation; they serve a three-year term
> without compensation.   Their successors are elected by the
> corporation's members and also serve for three years. The directors
> are empowered to do all things necessary or convenient in
> conducting the business of a corporation. . . . its directors are elected
> by its members and apparently are accountable only to them.  The
> general public exercises no control over them.  Not being created
> directly by the state and not being administered by individuals
> responsible to the public, Natchez Trace fails to meet either of the
> criteria one of which the Board requires of an entity before it can
> qualify for the political subdivision exemption."  *Id*. at 1045
> (footnotes omitted).

There are simply no section 152(2) cases of which we are aware that have held

an entity a majority of whose board of directors is selected and removable by

public officials and whose principle executive officers are likewise selected and

18

removable by public officials, is not one "administered by individuals who are responsible to public officials or to the general electorate" and is not a political subdivision for purposes of section 152(2).

## CONCLUSION

We recognize that we owe deference to the Secretary's interpretation of her own interpretive regulations, and that we may not prefer another reasonable interpretation over the reasonable interpretation of the Secretary. *Martin v. OSHRC*, 111 S.Ct. 1171, 1179 (1991). However, as the Court said in *Martin*, "we emphasize that the reviewing court should defer to the Secretary *only* if the Secretary's interpretation is reasonable." *Id*. at 1179-80 (emphasis added). We further emphasize that we are not construing the exact boundaries of section 652(5) or the scope of the Secretary's power to promulgate regulations defining "political subdivision of a State" as used therein. Rather, as in *Hawkins County*, we simply determine whether the Secretary's interpretation of section 1975.5, as applied here, is reasonable. We hold it is not.

The second alternative "test" of section 1975.5(b)(2) is whether StarTran is "administered by individuals who are controlled by public officials and responsible to such officials." Under any reasonable interpretation of those words, StarTran fits that definition: its board of directors is selected and removable by the CEO of Capital Metro, a public official (Capital Metro being a public political entity, five of the seven members of whose board of directors are officials elected by the general electorate) and StarTran's principle executive officers are all at will employees hired and subject to termination or transfer (and to having their pay set by) by Capital Metro's CEO; StarTran has no assets except its employees, and in substance has no existence independent of capital Metro (its creator) and no relationship with any other party (apart from the union). And, we are unaware of any court decision holding that an entity a majority of whose board of directors, and whose principle executive officers, are

subject to selection and removal by one or more public officials or public entities does *not* meet the above quoted second alternative test of section 1975.5(b)(2) so as to be a political subdivision under section 652(5).

We hold that the ALJ's decision on remand, relying on the Secretary's contention that, despite Capital Metro's control of the StarTran board and executives, StarTran "controls the day to day working conditions of its employees" or has "day to day control of [its] employees" and hence fails to meet the section 1975.5(b)(2) test, is an unreasonable interpretation of section 1975.5. The matters of "control of day to day working conditions of employees" or "day-to-day control of employees," or the equivalent thereof, *are not mentioned anywhere* in section 1975.5. The "factors" mentioned in section 1975.5(c) as examples of those which may be "taken into account" in regard to whether either of the "tests" of section 1975.5(b) is met, overwhelmingly point to StarTran's satisfaction of the section 1975.5(b)(2) criteria. While it is true that section 1975.5(d) does state that the section 1975.5(c) "list of factors is not exclusive," that, in our view, is simply not a sufficient basis on which to reasonably construe section 1975(b)(2) – which states one of the two alternative "tests" for meeting the exemption – as being subject to a requirement *nowhere mentioned* in the entire regulation and which seems strongly contrary to any reasonable understanding of the wording of section 1975.5(b)(2) as written. Moreover, the jurisprudence above cited clearly reflects that section 1975.5(b)(2) concerns itself with whether the board of directors and/or the "managerial officers" of the asserted "political subdivision" (not its foremen or lower level supervisors) are "controlled by public officials and responsible to" them "or to the general electorate." To allow the Secretary to add, on an ad hoc individual case by case basis, controlling requirements for meeting the political subdivision test of section 1975(b)(2) that are nowhere mentioned in section 1975.5, is to in effect render the regulation meaningless, and essentially say that a political

20

subdivision is whatever the Secretary thinks it is in each or any particular case. That is simply not reasonable. *See, e.g., Acadian Gas Pipeline System v. FERC*, 878 F.2d 865, 868 (5th Cir. 1989) ("While an agency interpretation of a regulation is entitled to due deference, the interpretation must rationally flow from the language of the regulation . . .").

We reverse the decision of the Commission and render judgment dismissing the citation against StarTran.

REVERSED and RENDERED.