# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
September 21, 2018

Lyle W. Cayce
Clerk

No. 17-60364

VOICES FOR INTERNATIONAL BUSINESS AND EDUCATION,
INCORPORATED, doing business as International High School of New
Orleans,

      Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

      Respondent Cross-Petitioner

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

Before ELROD, COSTA, and HO, Circuit Judges.

GREGG COSTA, Circuit Judge:

The National Labor Relations Act does not apply to a "political subdivision" of a state. 29 U.S.C. § 152(2). We decide whether a Louisiana charter school qualifies for that exemption from federal labor law.

## I.

Nowhere in the country has the charter school movement garnered a greater foothold than New Orleans. More than 90% of public-school students in Orleans Parish now attend charters. The reconstruction of the city after Hurricane Katrina was the impetus for the meteoric growth of charter schools.

No. 17-60364

*See* Amelia A. DeGory, *The Jurisdictional Difficulties of Defining Charter-School Teachers Unions Under Current Labor Law,* 66 DUKE L.J. 379, 387 (2016); Amy Moore, *Brokering Education: A Study of Charter Receipt, Renewal, and Revocation in Louisiana's Charter Schools*, 11 LOY. J. PUB. INT. L. 343, 343–44 (2010).

But the Louisiana law allowing charter schools predates that disaster. Enacted in 1995, the Louisiana Charter School Demonstration Programs law "authoriz[es] the creation of innovative kinds of independent public schools for pupils." La. Rev. Stat. Ann. § 17:3972(A). It allows various groups and entities, such as "ten or more citizens" or a "business or corporate entity registered to do business in Louisiana" to form a nonprofit corporation for the purpose of forming a charter school. *Id.* § 17:3983(A)(1)(a), (d). A local school board may enter into a charter with such a corporation if the board finds that the charter is "valid, complete, financially well-structured, and educationally sound." *Id.* § 17:3983(A)(4)(a). The state board of education may also approve charters. *Id.* § 17:3983(A)(4)(b). A charter school's governing board, not the state, employs faculty and staff, and the nonprofit operator shall have "exclusive authority over all employment decisions at the charter schools." *Id.* § 17:3997(A)(1)(a)–(b).

A group of citizens incorporated Voices for International Business and Education as a nonprofit in 2009. That same year Voices began operating the International High School of New Orleans under a Type 2[1] charter with the Louisiana Board of Elementary and Secondary Education. The charter provides that Voices will not participate in the Teachers' Retirement System

---

[1] A Type 2 charter is a new startup school authorized by the Louisiana Board of Elementary and Secondary Education. A Type 1 charter is a startup authorized by a local school board. Other types of charters apply to converted public schools authorized as charters by either the state board or a local school board. *See* La. Rev. Stat. Ann. § 17:3973(2)(b).

No. 17-60364

of Louisiana or the Louisiana School Employees' Retirement System; that Voices shall be the "final authority" in all matters affecting the school; and that Voices is "not acting as the agent of, or under the direction and control of" the state education board, except as specifically required by law or the charter.

Voices' corporate bylaws vest its powers in a board of directors. The articles of incorporation name the original directors. The original board has to approve any new directors, officers, and committee chairs. Any board member may be removed with or without cause by a three-fourths vote of the remaining members. The state can remove a board member only if the member violates state ethics rules. La. Rev. Stat. Ann. § 17:3996(B)(20); La. Rev. Stat. Ann. § 42:1153(B).

A labor union, the United Teachers of New Orleans, filed a petition with the National Labor Relations Board seeking to represent Voices employees. Voices objected on the ground that the Board lacked jurisdiction because Voices is a political subdivision of Louisiana. A hearing officer rejected that argument. Over a dissent, the NLRB agreed that Voices is not a political subdivision because it "was neither created directly by the state of Louisiana so as to constitute a department or administrative arm of the government nor administered by individuals who are responsible to public officials or the general electorate." The Board also rejected Voices' request that it exercise its discretion to decline jurisdiction under 29 U.S.C. § 164(c)(1).

In the election that followed, the employees voted in favor of union representation. Voices refused to recognize or negotiate with the union, maintaining the view that it is exempt from NLRB jurisdiction. The union then filed a charge against Voices for refusal to bargain. The NLRB found that Voices had committed an unfair labor practice and ordered it to recognize and bargain with the union. This petition for review, which presents only the "political subdivision" question, followed.

3

No. 17-60364

## II.

The National Labor Relations Act applies to most private employers. But its jurisdiction does not extend to the federal government or "any State or political subdivision thereof."  29 U.S.C. § 152(2).  The reason it does not regulate the labor relations of government employees is that they "did not usually enjoy the right to strike."  *N.L.R.B. v. Nat. Gas Util. Dist. of Hawkins Cty.*, 402 U.S. 600, 605 (1971).  That is not the case in Louisiana, *Davis v. Henry*, 555 So. 2d 457, 461–62, 464–66 (La. 1990), but its anomalous state labor law does not affect the question of federal labor law we confront: whether Voices is a political subdivision of Louisiana.  *Hawkins Cty.*, 402 U.S. at 604.

The Act does not define "political subdivision."  *Id.*  The NLRB has long defined it to include two situations: when an entity is "(1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate."  *Id.* at 604–05.  The Supreme Court has said that this agency definition is "entitled to great respect."  *Id.* at 605.

But we need not give any deference to the Board on this question.[2]  The Board's definition is consistent with the common meaning of "political subdivision" of a state.  The Board's first category—entities created by and operated as part of state or local government—fits easily within that ordinary meaning.  So does an entity that is controlled by public officials or the polity more generally.  The key is that for both of the Board's definitions of political subdivision, ultimate authority over policymaking remains with the public. *N.L.R.B. v. Natchez Trace Elec. Power Ass'n*, 476 F.2d 1042, 1045 (5th Cir.

---

[2] We thus see no disagreement with the concurring opinion on the analysis and outcome of this case: the entire panel agrees that Voices is not a political subdivision under the plain meaning of the NRLA exemption.  Because resolution of this case does not turn on agency deference, be it *Chevron* or some other form, the majority opinion does not explore those academic questions.

No. 17-60364

1973) (characterizing the Board's two-part definition as capturing when "[t]he general public exercises [] control" over the entity).

Voices lacks that political accountability. That is by design. One of the perceived virtues, if not *the* virtue, of charter schools is that a lack of political oversight gives them freedom to experiment.[3]  *See* La. Rev. Stat. Ann. § 17:3972(A). Successful innovations, the idea is, will not just benefit the school that tests them but will set an example for reform that even traditional public schools might later adopt. *Cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

Louisiana charter school operators like Voices enjoy that greater freedom to innovate because they are not controlled by political actors. The corporation selected the inaugural board of directors. Those privately selected board members are the only ones who can nominate and select additional or replacement members. The self-perpetuating board can also remove a member with or without cause. Unlike traditional public schools, which are typically governed by elected school boards, there is thus no public mechanism for changing the policies in schools Voices operates. Privately selected citizens set those policies and get to decide whether they are altered. *See N.L.R.B. v. Highview, Inc.*, 590 F.2d 174, 176 (5th Cir.) (explaining that because the board of a nonprofit corporation operating nursing homes in county-owned facilities

---

[3] Some of the "innovative school missions" of Type 2 charter schools in Louisiana are "serving military families," "providing foreign-language immersion programs," "online schooling for families who need flexibility," and "programs specifically designed to educate and remediate students with dyslexia." *Locating Type 2 Public Charter Schools in Louisiana*, LA. ASS'N PUB. CHARTER SCH. (Mar. 16, 2018), https://lacharterschools.org/locating-type-2-public-charter-schools-louisiana/.

was "self-perpetuating," the "county cannot influence the directors selection or affect the directors' decisions"), *vacated in part on reh'g on other grounds*, 595 F.2d 339 (5th Cir. 1979).

Voices points to one narrow way in which public officials can affect the composition of its board. The charter allows the Louisiana Ethics Adjudicatory Board to remove a Voices director for violations of laws it enforces. *See* La. Rev. Stat. Ann. § 42:1153(B). But this possibility of for-cause termination when a Voices board member violates state ethics laws does not give public officials policymaking authority over the corporation. In the event of a director's removal for ethics violations (something that has never happened at Voices), the corporation's board of directors would have sole authority to select any replacement. That distinguishes Louisiana's removal authority from the remove-*and-replace* authority the public enjoyed for corrupt commissioners of a Tennessee natural gas utility district that the Supreme Court classified as a political subdivision. *See Hawkins Cty.*, 402 U.S. at 607–08. Any commissioner Tennessee removed for "misfeasance or nonfeasance" would be replaced in most counties by public officials (the two other publicly appointed commissioners, or if they could not agree, the county judge) or in large counties by an election. *Id.* That ensured every commissioner of the utility district would be publicly selected. None of Voices' directors can be.[4]

---

[4] Louisiana law sets some eligibility criteria for a charter's directors. For example, school employees may not serve and no more than 20% of the directors can be from the same immediate family. La. Rev. Stat. Ann. § 17:3991(A)(1)(c)(i)–(ii). And Voices' charter requires that the board consist of at least seven members with diverse skill sets and that at least 60% live in the parish where the school is located. Although these conflict-of-interest and geographic constraints limit who can serve on the board, they do not mean that those who are selected are accountable to the public for their policy choices. *See, e.g., Ky. River Cmty. Care, Inc. v. N.L.R.B.*, 193 F.3d 444, 451–52 (6th Cir. 1999) (determining that a nonprofit organization operating mental health facilities was not administered by individuals responsible to public officials or the general electorate despite the fact that Kentucky law required the board to "be representative of the community the corporation serves").

No. 17-60364

A recent NLRB ruling that a Texas charter school is a "political subdivision" illustrates the importance the Board places on whether the public has a role in selecting an entity's policymakers. *LTTS Charter Sch., Inc. d/b/a Universal Acad.*, 366 N.L.R.B. No. 38 (2018); *see also The Penn. Virtual Charter Sch.*, 364 NLRB No. 87, at *9–11 (2016); *Hyde Leadership Charter Sch.*, 364 NLRB No. 88, at *6–7 (2016) (rejecting the "political subdivision" exemption for charter schools in Pennsylvania and New York that like Voices lack public accountability). What differed in that case is the Texas Education Agency retained "full authority to reconstitute" the charter school's board. *LTTS Charter Sch., Inc.*, 366 N.L.R.B. No. 38, at *3 (citing TEX. EDUC. CODE § 12.115). The state agency could remove board members for a host of reasons, including violations of the charter; fiscal malfeasance; student health and welfare concerns; violations of applicable laws or rules; failure to satisfy performance standards; and insolvency. *Id.* Following any such removal, the state had "broad, and practically unreviewable, authority to reconstitute the Board," which led the NLRB to conclude the charter was "administered by individuals who are responsible to public TEA officials." *Id.* (citing TEX. EDUC. CODE § 12.115).[5]

There is no way for the public to select the board members who set policy for Voices. We thus agree with the Board that Voices is "not administered by individuals who are responsible to public officials or to the general electorate."[6]

---

[5] We are not presented with and thus do not decide the question whether Texas charter schools are political subdivisions. We cite *LTTS Charter School* to show the emphasis the NLRB places on public involvement in selection and removal of policymakers.

[6] Voices has never contended that it satisfies the Board's first definition that treats entities created by the State as political subdivisions. An amicus makes that argument, but we do not consider arguments raised by an amicus that the party it is supporting never made. *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 752 n.3 (5th Cir. 2009). In any event, we have held it is "self-evident" that a nonprofit corporation incorporated

7

No. 17-60364

*See Natchez Trace Elec. Power Ass'n*, 476 F.2d at 1045 (concluding that an electric power association was not "administered by individuals responsible to the public" because the directors of the corporation were named in the certificate of incorporation and successors were chosen by the corporation's members).  And we have already said that standard is faithful to the ordinary meaning of "political subdivision."  There may be some situations in which it is ambiguous whether an entity is subject to enough public control to make it a political subdivision of the state.  This is not such a case.  Louisiana does not control Voices.

That brings us to Voices' broader complaint.  It argues that the Board ignored factors that demonstrate Voices' political character even if it is not run by people the public selects.  It relies on the public features of a utility district the Supreme Court identified in addressing whether it was a political subdivision.  *Hawkins Cty.*, 402 U.S. at 608–09.  In addition to emphasizing that the "commissioners [] are beholden to an elected public official for their appointment, and are subject to removal procedures applicable to all public officials," *id.* at 608, *Hawkins County* cites further indicators of political subdivision status such as the entity's tax-exempt position, eminent domain power, and obligation to comply with open records laws, *id.* at 608–09.  Voices contends that a number of those same factors demonstrate its political nature, including public funding, tax-exempt status, and being subject to open records laws.

Was it error for the NLRB to look solely at whether the public created Voices or controls its administrators in deciding whether the charter is a political subdivision of Louisiana?  At a minimum, caselaw recognizes that that

---

by private actors is not "a department or administrative arm of the government." *Highview*, 590 F.2d at 176.

the direct questions the Board's definition asks—(1) public creation or (2) public control—are the predominant considerations. Our first "political subdivision" case concluded that an electric power association was not exempt because it did not meet either of those NLRB criteria. *Natchez Trace Elec. Power Ass'n*, 476 F.2d at 1045. Only then did it note as a "[f]urthermore" that the association also "possesse[d] few of the other characteristics which the Supreme Court deemed indicative of the Hawkins County Utility District's public nature." *Id.*

Our most recent case on this topic, which addressed the same exemption in the Occupational Safety and Health Act,[7] discussed those factors only in a "we also note" footnote. *StarTran, Inc. v. Occupational Safety & Health Review Comm'n*, 608 F.3d 312, 321 n.12 (5th Cir. 2010). More important than that, *StarTran* observed that "[t]here are simply no . . . cases" rejecting political subdivision status for "an entity a majority of whose board of directors is selected and removable by public officials and whose principle executive officers are likewise selected and removable by public officials." *Id.* at 324. The clincher is what *StarTran* emphasizes about the opposite situation, which is the one we confront: "if a majority of the board of directors of the claimed political subdivision is *not* subject to selection or removal by public officials or the general electorate, then the entity *for that reason* fails the second alternative test for being a[ ]political subdivision." *Id.* at 323; *see also Midwest Div.-MMC, LLC v. N.L.R.B.*, 867 F.3d 1288, 1297 (D.C. Cir. 2017) ("[T]he pertinent question is 'whether a majority of the individuals who administer the entity . . . are appointed by and subject to removal by public officials.'" (quoting *Pilsen Wellness Ctr.*, 359 N.L.R.B. 626, 628 (2013))); *FiveCAP, Inc. v. N.L.R.B.*,

---

[7] We consider caselaw applying both exemptions because the statutory language is the same. *StarTran*, 608 F.3d at 323 n.14 (citing *Brock v. Chi. Zoological Soc'y.*, 820 F.2d 909, 910 (7th Cir. 1987)).

No. 17-60364

294 F.3d 768, 777 (6th Cir. 2002) ("An entity can only satisfy the second prong of *Hawkins County* by ensuring that a majority of its board of directors are directly responsible to the general electorate."); *Jefferson Cty. Cmty. Ctr. for Developmental Disabilities v. N.L.R.B.,* 732 F.2d 122, 126 (10th Cir. 1984) (holding that an entity was not exempt as a political subdivision under section 152(2) "although seven directors are appointed by public agencies" because "a majority of the Board is neither appointed by nor subject to removal by public officials or the general electorate and has no official connection to any governmental body"); *Truman Med. Ctr., Inc. v. N.L.R.B.,* 641 F.2d 570, 572–73 (8th Cir. 1981) (holding that a hospital was not exempt from NLRB jurisdiction because the majority of its board of directors was neither appointed nor subject to removal by public officials or the general public).

We thus cannot fault the Board for basing its decision on the appointment and removal power that has been the decisive factor in every reported judicial decision addressing "political subdivision" status under the NLRA or OSHA. *See StarTran*, 608 F.3d at 323; M. Edward Taylor, Note, *The Political Subdivision Exemption of the National Labor Relations Act and the Board's Discretionary Authority*, 1982 DUKE L.J. 733, 739 n.37 (1982) (noting then that in no NLRB or judicial decision had *Hawkins County*'s "actual operations" factors resulted in a decision contrary to what the Board's two-part test focused on public accountability counseled). That is especially so when Voices did not just have a majority of its board members selected without public input; private actors selected all of them.[8] The additional factors *Hawkins County* noted may provide guidance to the Board and courts in some cases, perhaps those when there is both public and private influence over the

---

[8] We also note that not all of the additional factors point in favor of Voices being a political subdivision. Unlike the utility district in *Hawkins County*, Voices does not have eminent domain power.

No. 17-60364

policymakers.  But in this case they cannot override the significance of the entirely private selection of school policymakers, a feature at odds with the ordinary conception of a political subdivision of a state.

Voices contends that a different result is warranted because of the "unique factual context" in which roughly 90% of public school students in New Orleans attend charters.  Charters essentially are the public school system in New Orleans, it argues.  We do not disagree, but the prevalence of charters does not transform them into politically accountable entities.  It would make little sense if a charter located in northern Louisiana but otherwise identical to Voices were subject to federal labor law but Voices were exempt solely because it is in a city with a lot of other charters.  Or imagine a scenario in which a legislature decided to privatize an entire state function, prisons for example.  If those prisons were not subject to public control, we do not see why they would become political subdivisions just because they held all prisoners in the state.  Nothing about the ordinary meaning of political subdivision turns on the prevalence of charter schools as opposed to their public accountability.

We recognize that charters like Voices are "independent public school[s]" under Louisiana law and are treated as part of the public school system for some purposes.  *See* La. Rev. Stat. Ann. § 17:3973(2)(a); *Iberville Par. Sch. Bd. v. La. State Bd. of Elementary & Secondary Educ.*, 2017-0257, 2018 WL 1319404, at *7 (La. Mar. 13, 2018) (rejecting challenge to public funding of charter schools).  But that is not the same thing as saying they are political subdivisions of the state.  The Louisiana Attorney General has recognized this distinction, concluding that "a charter school is not a political subdivision of the state."  La. Atty. Gen. Op. No. 04-0317, 2004 WL 2843115, at *3 (Nov. 23, 2004) (addressing whether the Louisiana Open Meetings Law applied to a charter school).  Indeed, the "independent" part of the state law label reflects their lack of political accountability.

11

No. 17-60364

That lack of political influence over Louisiana charters was a choice the legislature made in its enabling legislation. Private control was not a bug of that law; it was a reason for it. Because Louisiana chose to insulate its charters from the political process, Voices like most other privately controlled employers is subject to the National Labor Relations Act.

\* \* \*

Voices' petition for review is DENIED. The Board's cross-petition for enforcement is GRANTED.

No. 17-60364

JAMES C. HO, Circuit Judge, concurring:

I agree with the National Labor Relations Board that the charter school operated by Voices for International Business and Education is subject to collective bargaining under the National Labor Relations Act.

Voices contends that its charter school is a "political subdivision" and thus exempt from the Act. But it seems obvious that charter schools are not "political subdivisions," but private organizations—owned and operated by private citizens, not political officials. Indeed, charter schools are appealing to many parents and students precisely because they are *not* political subdivisions. As the majority nicely puts it: "Private control was not a bug of [the Louisiana charter school law]; it was a reason for it." After all, one of the primary benefits of charter schools is the ability to harness private sector innovation and offer alternative educational opportunities unconstrained by politics. The parties seemed to acknowledge as much during oral argument. Oral Argument at 3:45–4:05 (appellant); 16:45–17:04 (appellee). Accordingly, I agree that the charter school operated by Voices is not a political subdivision, and I am pleased to join the majority opinion for that reason.

I nevertheless write separately to make clear that, although I agree with the Board's ultimate conclusion in this case, I disagree with its reasoning. For the Board does not merely argue that it is faithfully following Congress's directive. Rather, it asserts that we must defer to the Board's decision. *See, e.g.*, Br. of Appellee at 14 ("The Board's interpretation of the Act must be upheld if reasonably defensible. . . . This deferential standard of review applies to every interpretation of the Act by the Board."); Oral Argument at 25:15–20 (claiming Board discretion to determine which entities are subject to the Act).

Charter schools are unambiguously private organizations, not political subdivisions. So I disagree with the Board's request for deference to the extent

that it claims the power to reach the opposite result in another charter school case—for example, as the majority points out, the Board subjects Voices to collective bargaining, even as it attempts to exempt other charter schools from the Act. I therefore write separately to make clear that, by affirming the Board's decision today, I do not bless the Board's discretion to take the opposite view tomorrow. *See*, *e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction . . . if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.").

Even in the age of *Chevron*, deference is not a blind commandment. Federal agencies must enforce the law as written by Congress. I concur.

## I.

The Board claims it has the discretion to decide who is and is not a political subdivision—and thus which workers may or may not engage in collective bargaining—and that this Court must defer to its determination. This is the natural implication of the Board's invocation of *Chevron*.

But under *Chevron*, we owe deference only to agency interpretations of *ambiguous* statutes. As *Chevron* sets forth, courts must generally construe ambiguity in statutory text as an implicit delegation of rulemaking authority to the agency. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984); *see also United States v. Mead Corp.*, 533 U.S. 218, 229 (2001); *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("[T]he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency."); *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 356 (5th Cir. 2013) ("We give to the Board 'judicial deference when it interprets an ambiguous provision of a statute that it administers.'") (quoting *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536 (1992)).

No. 17-60364

Absent statutory ambiguity, however, agencies do not have the authority to decide what the law shall be.  So when an agency invokes *Chevron* deference where it does not belong (because the relevant statutory text is *not* ambiguous), it is not deferring to Congress's exercise of legislative authority, but rather doing exactly the opposite—here, claiming for itself the power to grant or deny collective bargaining rights at particular workplaces.

This is no hypothetical concern.  In this case, the Board asserts that Louisiana charter schools are subject to collective bargaining, but that Texas charter schools are not.  *See generally LTTS Charter Sch., Inc. d/b/a Universal Acad. & Kimberly Free*, 366 NLRB No. 38 (Mar. 15, 2018); Supplemental Authority of Appellees (Mar. 19, 2018) ("Appellee 28(j)"); Oral Argument at 27:10–28:04.  The Board attempts to distinguish charter schools in Texas from those in Louisiana on the ground that "the Texas Education Code 'explicitly grants' the Texas Commissioner of Education broad authority to 'reconstitut[e]' the charter school's governing board by appointing new members or retaining current ones."  Appellee 28(j) at 1–2 (citing *LTTS*, 366 NLRB No. 38, at 1 n.1).  But even if this means that, under certain conditions, Texas has the power to transform a private, nonprofit charter school into a political subdivision at some point in the future, it is far from clear how that makes the charter school a political subdivision today.  To use an analogy: The majority correctly points out that Texas could theoretically privatize its prison system someday in the future.  But that does not mean Texas prisons are not part of state government today.  The distinction that the Board seeks to draw finds no support in any statutory text set forth by Congress.

There is no ambiguity here.  Charter schools that are privately opened and privately operated by privately chosen board members are unambiguously private entities, not political subdivisions.  Accordingly, Congress has directed that those workplaces shall be subject to collective bargaining under the Act.

15

No. 17-60364

*Chevron* affords the Board no authority to alter this determination. Under *Chevron*, only Congress has that power.

## II.

Because the Board's claim of deference is wrong under *Chevron*, its demand for judicial deference raises constitutional concerns as well.

Congress has the power to make laws, and courts have the power to interpret them. And the separation of these respective powers from one another, and from the Executive, is an essential principle of our Founding vision. *See, e.g.*, *Bond v. United States*, 564 U.S. 211, 222 (2011) ("Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well.").

Indeed, it is the consolidation of legislative and judicial power in executive agencies that has caused *Chevron* to be called into question by various Justices. *See, e.g.*, *Pereira v. Sessions*, 138 S. Ct. 2105, 2120–21 (2018) (Kennedy, J., concurring); *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2712–14 (2015) (Thomas, J., concurring); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149–58 (10th Cir. 2016) (Gorsuch, J., concurring).

As Justice Alito has recently reminded, of course, *Chevron* remains binding Supreme Court precedent. *See Pereira*, 138 S. Ct. at 2129 (Alito, J., dissenting). But it nevertheless remains the duty of every court to apply *Chevron* correctly. Under *Chevron*, we do not owe every agency interpretation our "reflexive deference." *Pereira*, 138 S. Ct. at 2120 (Kennedy, J., concurring). Courts "need not resort to *Chevron* deference" when "Congress has supplied a clear and unambiguous answer to the interpretive question at hand." *Id.* at 2113 (opinion of the Court). And that is particularly so when we are considering the boundaries of agency authority, as we are here. *See City of*

No. 17-60364

*Arlington v. FCC*, 569 U.S. 290, 307 (2013) ("The fox-in-the-henhouse syndrome is to be avoided . . . by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority.   Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow.").

Threshold questions like ambiguity under *Chevron* are not just perfunctory speedbumps.   They are the means by which we are asked to apportion interpretive power between the judicial and executive branches, as well as legislative power between the legislative and executive branches.  *See Michigan*, 135 S. Ct. at 2712 (Thomas, J., concurring) ("We most often describe Congress' supposed choice to leave matters to agency discretion as an allocation of interpretive authority.  But we sometimes treat that discretion as though it were a form of legislative power.") (internal citations omitted).

Finding ambiguity where it does not exist—granting deference where it is not warranted—does not simply result in a nominal misallocation of power between different branches of government.  It means that policymaking is no longer undertaken where it is most accountable to the people.  And it means that government action is no longer undertaken in the manner that is most amenable to robust judicial review.

\* \* \*

Our Founders did not separate power for its own sake, but to preserve liberty.  Because the only way to preserve liberty is to constrain the exercise of power.  So we separate power to limit power.  By diffusing power across the three rival branches of government, we make it difficult for government to gang up on the citizen.  For the Founders well understood that "'[t]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates,' or, 'if the power of judging be not separated

from the legislative and executive powers.'" THE FEDERALIST NO. 47 (James Madison) (quoting Baron de Montesquieu).

Accordingly, the Constitution divides power among the three branches, and requires government to run the gauntlet in order to exercise the coercive power of the sovereign.  First, lawmaking is located where it is most politically accountable, as it should be—in the hands of legislators elected by the people.  Second, law enforcement is separated from lawmaking, to avoid mob rule—in a separate branch of government under the authority of executive officials accountable to the President.  Third, we subject government action to review for legality by a judiciary that is independent of the other two branches.

Misuse of the *Chevron* doctrine means collapsing these three separated government functions into a single entity. So too with *Chevron*, to be sure.  But the misuse of *Chevron* in this case abrogates separation of powers without even the fig leaf of Congressional authorization.

Under its vision, the Board exercises lawmaking power by deciding who shall and shall not be subject to collective bargaining.  It exercises executive power by issuing orders requiring compliance by private parties.  And it demands that the judiciary defer to its actions.  In sum, the Board consolidates power into a single entity that is both unaccountable to the people via Congressional election and immune from robust judicial review.  That is not how the Constitution is supposed to work—and when it comes to unambiguous laws, it is not how *Chevron* is supposed to work.

Congress has spoken clearly here.  Charter schools are unambiguously private organizations, not political subdivisions.  Accordingly, the Board's claim of deference fails to comply with *Chevron*, never mind the Constitution.  Only Congress can make law.  So if law is to be made or changed, it must be done as the Constitution commands—through Article I, Section 7, not Article II, Section 2.  I concur.