GREGG COSTA, Circuit Judge:
*772 The National Labor Relations Act does not apply to a "political subdivision" of a state. 29 U.S.C. § 152(2). We decide whether a Louisiana charter school qualifies for that exemption from federal labor law.
I.
Nowhere in the country has the charter school movement garnered a greater foothold than New Orleans. More than 90% of public-school students in Orleans Parish now attend charters. The reconstruction of the city after Hurricane Katrina was the impetus for the meteoric growth of charter schools. See Amelia A. DeGory, The Jurisdictional Difficulties of Defining Charter-School Teachers Unions Under Current Labor Law, 66 DUKE L.J. 379, 387 (2016) ; Amy Moore, Brokering Education: A Study of Charter Receipt, Renewal, and Revocation in Louisiana's Charter Schools , 11 LOY J. PUB. INT. L. 343, 343-44 (2010).
But the Louisiana law allowing charter schools predates that disaster. Enacted in 1995, the Louisiana Charter School Demonstration Programs law "authoriz[es] the creation of innovative kinds of independent public schools for pupils." La. Rev. Stat. Ann. § 17:3972(A). It allows various groups and entities, such as "ten or more citizens" or a "business or corporate entity registered to do business in Louisiana" to form a nonprofit corporation for the purpose of forming a charter school. Id. § 17:3983(A)(1)(a), (d). A local school board may enter into a charter with such a corporation if the board finds that the charter is "valid, complete, financially well-structured, and educationally sound." Id. § 17:3983(A)(4)(a). The state board of education may also approve charters. Id. § 17:3983(A)(4)(b). A charter school's governing board, not the state, employs faculty and staff, and the nonprofit operator shall have "exclusive authority over all employment decisions at the charter schools." Id. § 17:3997(A)(1)(a)-(b).
A group of citizens incorporated Voices for International Business and Education as a nonprofit in 2009. That same year Voices began operating the International High School of New Orleans under a Type 2[1] charter with the Louisiana Board of Elementary and Secondary Education. The charter provides that Voices will not participate in the Teachers' Retirement System of Louisiana or the Louisiana School Employees' Retirement System; that Voices shall be the "final authority" in all matters affecting the school; and that Voices is "not acting as the agent of, or under the direction and control of" the state education board, except as specifically required by law or the charter.
Voices' corporate bylaws vest its powers in a board of directors. The articles of *773 incorporation name the original directors. The original board has to approve any new directors, officers, and committee chairs. Any board member may be removed with or without cause by a three-fourths vote of the remaining members. The state can remove a board member only if the member violates state ethics rules. La. Rev. Stat. Ann. § 17:3996(B)(20) ; La. Rev. Stat. Ann. § 42:1153(B).
A labor union, the United Teachers of New Orleans, filed a petition with the National Labor Relations Board seeking to represent Voices employees. Voices objected on the ground that the Board lacked jurisdiction because Voices is a political subdivision of Louisiana. A hearing officer rejected that argument. Over a dissent, the NLRB agreed that Voices is not a political subdivision because it "was neither created directly by the state of Louisiana so as to constitute a department or administrative arm of the government nor administered by individuals who are responsible to public officials or the general electorate." The Board also rejected Voices' request that it exercise its discretion to decline jurisdiction under 29 U.S.C. § 164(c)(1).
In the election that followed, the employees voted in favor of union representation. Voices refused to recognize or negotiate with the union, maintaining the view that it is exempt from NLRB jurisdiction. The union then filed a charge against Voices for refusal to bargain. The NLRB found that Voices had committed an unfair labor practice and ordered it to recognize and bargain with the union. This petition for review, which presents only the "political subdivision" question, followed.
II.
The National Labor Relations Act applies to most private employers. But its jurisdiction does not extend to the federal government or "any State or political subdivision thereof." 29 U.S.C. § 152(2). The reason it does not regulate the labor relations of government employees is that they "did not usually enjoy the right to strike." N.L.R.B. v. Nat. Gas Util. Dist. of Hawkins Cty. , 402 U.S. 600, 605, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971). That is not the case in Louisiana, Davis v. Henry , 555 So.2d 457, 461-62, 464-66 (La. 1990), but its anomalous state labor law does not affect the question of federal labor law we confront: whether Voices is a political subdivision of Louisiana. Hawkins Cty. , 402 U.S. at 604, 91 S.Ct. 1746.
The Act does not define "political subdivision." Id. The NLRB has long defined it to include two situations: when an entity is "(1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." Id. at 604-05, 91 S.Ct. 1746. The Supreme Court has said that this agency definition is "entitled to great respect." Id. at 605, 91 S.Ct. 1746.
But we need not give any deference to the Board on this question.[2] The Board's definition is consistent with the common meaning of "political subdivision" of a state. The Board's first category-entities created by and operated as part of state or local government-fits easily within that ordinary meaning. So does an entity that is *774 controlled by public officials or the polity more generally. The key is that for both of the Board's definitions of political subdivision, ultimate authority over policymaking remains with the public. N.L.R.B. v. Natchez Trace Elec. Power Ass'n , 476 F.2d 1042, 1045 (5th Cir. 1973) (characterizing the Board's two-part definition as capturing when "[t]he general public exercises [ ] control" over the entity).
Voices lacks that political accountability. That is by design. One of the perceived virtues, if not the virtue, of charter schools is that a lack of political oversight gives them freedom to experiment.[3] See La. Rev. Stat. Ann. § 17:3972(A). Successful innovations, the idea is, will not just benefit the school that tests them but will set an example for reform that even traditional public schools might later adopt. Cf. New State Ice Co. v. Liebmann , 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").
Louisiana charter school operators like Voices enjoy that greater freedom to innovate because they are not controlled by political actors. The corporation selected the inaugural board of directors. Those privately selected board members are the only ones who can nominate and select additional or replacement members. The self-perpetuating board can also remove a member with or without cause. Unlike traditional public schools, which are typically governed by elected school boards, there is thus no public mechanism for changing the policies in schools Voices operates. Privately selected citizens set those policies and get to decide whether they are altered. See N.L.R.B. v. Highview, Inc. , 590 F.2d 174, 176 (5th Cir.) (explaining that because the board of a nonprofit corporation operating nursing homes in county-owned facilities was "self-perpetuating," the "county cannot influence the directors selection or affect the directors' decisions"), vacated in part on reh'g on other grounds , 595 F.2d 339 (5th Cir. 1979).
Voices points to one narrow way in which public officials can affect the composition of its board. The charter allows the Louisiana Ethics Adjudicatory Board to remove a Voices director for violations of laws it enforces. See La. Rev. Stat. Ann. § 42:1153(B). But this possibility of for-cause termination when a Voices board member violates state ethics laws does not give public officials policymaking authority over the corporation. In the event of a director's removal for ethics violations (something that has never happened at Voices), the corporation's board of directors would have sole authority to select any replacement. That distinguishes Louisiana's removal authority from the remove-and-replace authority the public enjoyed for corrupt commissioners of a Tennessee natural gas utility district that the Supreme Court classified as a political subdivision. See Hawkins Cty. , 402 U.S. at 607-08, 91 S.Ct. 1746. Any commissioner Tennessee removed for "misfeasance or nonfeasance" would be replaced in most counties by public officials (the two other publicly appointed commissioners, or if *775 they could not agree, the county judge) or in large counties by an election. Id. That ensured every commissioner of the utility district would be publicly selected. None of Voices' directors can be.[4]
A recent NLRB ruling that a Texas charter school is a "political subdivision" illustrates the importance the Board places on whether the public has a role in selecting an entity's policymakers. LTTS Charter Sch., Inc. d/b/a Universal Acad. , 366 N.L.R.B. No. 38 (2018) ; see also The Penn. Virtual Charter Sch. , 364 NLRB No. 87, at *9 -11 (2016); Hyde Leadership Charter Sch. , 364 NLRB No. 88, at *6-7 (2016) (rejecting the "political subdivision" exemption for charter schools in Pennsylvania and New York that like Voices lack public accountability). What differed in that case is the Texas Education Agency retained "full authority to reconstitute" the charter school's board. LTTS Charter Sch., Inc. , 366 N.L.R.B. No. 38, at *3 (citing TEX. EDUC. CODE § 12.115 ). The state agency could remove board members for a host of reasons, including violations of the charter; fiscal malfeasance; student health and welfare concerns; violations of applicable laws or rules; failure to satisfy performance standards; and insolvency. Id. Following any such removal, the state had "broad, and practically unreviewable, authority to reconstitute the Board," which led the NLRB to conclude the charter was "administered by individuals who are responsible to public TEA officials." Id. (citing TEX. EDUC. CODE 12.115 ).[5]
There is no way for the public to select the board members who set policy for Voices. We thus agree with the Board that Voices is "not administered by individuals who are responsible to public officials or to the general electorate."[6] See Natchez Trace Elec. Power Ass'n , 476 F.2d at 1045 (concluding that an electric power association was not "administered by individuals responsible to the public" because the directors of the corporation were named in the certificate of incorporation and successors were chosen by the corporation's members). And we have already said that standard is faithful to the ordinary meaning of "political subdivision." There may be some situations in which it is ambiguous *776 whether an entity is subject to enough public control to make it a political subdivision of the state. This is not such a case. Louisiana does not control Voices.
That brings us to Voices' broader complaint. It argues that the Board ignored factors that demonstrate Voices' political character even if it is not run by people the public selects. It relies on the public features of a utility district the Supreme Court identified in addressing whether it was a political subdivision. Hawkins Cty. , 402 U.S. at 608-09, 91 S.Ct. 1746. In addition to emphasizing that the "commissioners [ ] are beholden to an elected public official for their appointment, and are subject to removal procedures applicable to all public officials," ids="11734842" index="34" url="https://cite.case.law/us/402/600/#p605">id. at 608, 91 S.Ct. 1746, Hawkins County cites further indicators of political subdivision status such as the entity's tax-exempt position, eminent domain power, and obligation to comply with open records laws, ids="11734842" index="36" url="https://cite.case.law/us/402/600/#p605">id. at 608-09, 91 S.Ct. 1746. Voices contends that a number of those same factors demonstrate its political nature, including public funding, tax-exempt status, and being subject to open records laws.
Was it error for the NLRB to look solely at whether the public created Voices or controls its administrators in deciding whether the charter is a political subdivision of Louisiana? At a minimum, caselaw recognizes that that the direct questions the Board's definition asks-(1) public creation or (2) public control-are the predominant considerations. Our first "political subdivision" case concluded that an electric power association was not exempt because it did not meet either of those NLRB criteria. Natchez Trace Elec. Power Ass'n , 476 F.2d at 1045. Only then did it note as a "[f]urthermore" that the association also "possesse[d] few of the other characteristics which the Supreme Court deemed indicative of the Hawkins County Utility District's public nature." Id.
Our most recent case on this topic, which addressed the same exemption in the Occupational Safety and Health Act,[7] discussed those factors only in a "we also note" footnote. StarTran, Inc. v. Occupational Safety & Health Review Comm'n , 608 F.3d 312, 321 n.12 (5th Cir. 2010). More important than that, StarTran observed that "[t]here are simply no ... cases" rejecting political subdivision status for "an entity a majority of whose board of directors is selected and removable by public officials and whose principle executive officers are likewise selected and removable by public officials." Id. at 324. The clincher is what StarTran emphasizes about the opposite situation, which is the one we confront: "if a majority of the board of directors of the claimed political subdivision is not subject to selection or removal by public officials or the general electorate, then the entity for that reason fails the second alternative test for being a[ ]political subdivision." Id. at 323 ; see also Midwest Div.-MMC, LLC v. N.L.R.B. , 867 F.3d 1288, 1297 (D.C. Cir. 2017) ("[T]he pertinent question is 'whether a majority of the individuals who administer the entity ... are appointed by and subject to removal by public officials.' " (quoting Pilsen Wellness Ctr. , 359 N.L.R.B. 626, 628 (2013) ) ); FiveCAP, Inc. v. N.L.R.B. , 294 F.3d 768, 777 (6th Cir. 2002) ("An entity can only satisfy the second prong of Hawkins County by ensuring that a majority of its board of directors are directly responsible to the general electorate.");
*777 Jefferson Cty. Cmty. Ctr. for Developmental Disabilities v. N.L.R.B., 732 F.2d 122, 126 (10th Cir. 1984) (holding that an entity was not exempt as a political subdivision under section 152(2)"although seven directors are appointed by public agencies" because "a majority of the Board is neither appointed by nor subject to removal by public officials or the general electorate and has no official connection to any governmental body"); Truman Med. Ctr., Inc. v. N.L.R.B. , 641 F.2d 570, 572-73 (8th Cir. 1981) (holding that a hospital was not exempt from NLRB jurisdiction because the majority of its board of directors was neither appointed nor subject to removal by public officials or the general public).
We thus cannot fault the Board for basing its decision on the appointment and removal power that has been the decisive factor in every reported judicial decision addressing "political subdivision" status under the NLRA or OSHA. See StarTran , 608 F.3d at 323 ; M. Edward Taylor, Note, The Political Subdivision Exemption of the National Labor Relations Act and the Board's Discretionary Authority , 1982 DUKE L.J. 733, 739 n.37 (1982) (noting then that in no NLRB or judicial decision had Hawkins County 's "actual operations" factors resulted in a decision contrary to what the Board's two-part test focused on public accountability counseled). That is especially so when Voices did not just have a majority of its board members selected without public input; private actors selected all of them.[8] The additional factors Hawkins County noted may provide guidance to the Board and courts in some cases, perhaps those when there is both public and private influence over the policymakers. But in this case they cannot override the significance of the entirely private selection of school policymakers, a feature at odds with the ordinary conception of a political subdivision of a state.
Voices contends that a different result is warranted because of the "unique factual context" in which roughly 90% of public school students in New Orleans attend charters. Charters essentially are the public school system in New Orleans, it argues. We do not disagree, but the prevalence of charters does not transform them into politically accountable entities. It would make little sense if a charter located in northern Louisiana but otherwise identical to Voices were subject to federal labor law but Voices were exempt solely because it is in a city with a lot of other charters. Or imagine a scenario in which a legislature decided to privatize an entire state function, prisons for example. If those prisons were not subject to public control, we do not see why they would become political subdivisions just because they held all prisoners in the state. Nothing about the ordinary meaning of political subdivision turns on the prevalence of charter schools as opposed to their public accountability.
We recognize that charters like Voices are "independent public school[s]" under Louisiana law and are treated as part of the public school system for some purposes. See La. Rev. Stat. Ann. § 17:3973(2)(a) ; Iberville Par. Sch. Bd. v. La. State Bd. of Elementary & Secondary Educ. , 248 So.3d 299, 307-08 (La. 2018) (rejecting challenge to public funding of charter schools). But that is not the same thing as saying they are political subdivisions of the state. The Louisiana Attorney General has recognized this distinction, concluding that "a charter school is not a political subdivision of the state."
*778 La. Atty. Gen. Op. No. 04-0317, 2004 WL 2843115, at *3 (Nov. 23, 2004) (addressing whether the Louisiana Open Meetings Law applied to a charter school). Indeed, the "independent" part of the state law label reflects their lack of political accountability.
That lack of political influence over Louisiana charters was a choice the legislature made in its enabling legislation. Private control was not a bug of that law; it was a reason for it. Because Louisiana chose to insulate its charters from the political process, Voices like most other privately controlled employers is subject to the National Labor Relations Act.
* * *
Voices' petition for review is DENIED. The Board's cross-petition for enforcement is GRANTED.

A Type 2 charter is a new startup school authorized by the Louisiana Board of Elementary and Secondary Education. A Type 1 charter is a startup authorized by a local school board. Other types of charters apply to converted public schools authorized as charters by either the state board or a local school board. See La. Rev. Stat. Ann. § 17:3973(2)(b).

We thus see no disagreement with the concurring opinion on the analysis and outcome of this case: the entire panel agrees that Voices is not a political subdivision under the plain meaning of the NRLA exemption. Because resolution of this case does not turn on agency deference, be it Chevron or some other form, the majority opinion does not explore those academic questions.

Some of the "innovative school missions" of Type 2 charter schools in Louisiana are "serving military families," "providing foreign-language immersion programs," "online schooling for families who need flexibility," and "programs specifically designed to educate and remediate students with dyslexia." Locating Type 2 Public Charter Schools in Louisiana , La. Ass'n Pub. Charter Sch. (Mar. 16, 2018), https://lacharterschools.org/locating-type-2-public-charter-schools-louisiana/.

Louisiana law sets some eligibility criteria for a charter's directors. For example, school employees may not serve and no more than 20% of the directors can be from the same immediate family. La. Rev. Stat. Ann. § 17:3991(A)(1)(c)(i)-(ii). And Voices' charter requires that the board consist of at least seven members with diverse skill sets and that at least 60% live in the parish where the school is located. Although these conflict-of-interest and geographic constraints limit who can serve on the board, they do not mean that those who are selected are accountable to the public for their policy choices. See, e.g. , Ky. River Cmty. Care, Inc. v. N.L.R.B. , 193 F.3d 444, 451-52 (6th Cir. 1999) (determining that a nonprofit organization operating mental health facilities was not administered by individuals responsible to public officials or the general electorate despite the fact that Kentucky law required the board to "be representative of the community the corporation serves").

We are not presented with and thus do not decide the question whether Texas charter schools are political subdivisions. We cite LTTS Charter School to show the emphasis the NLRB places on public involvement in selection and removal of policymakers.

Voices has never contended that it satisfies the Board's first definition that treats entities created by the State as political subdivisions. An amicus makes that argument, but we do not consider arguments raised by an amicus that the party it is supporting never made. World Wide St. Preachers Fellowship v. Town of Columbia , 591 F.3d 747, 752 n.3 (5th Cir. 2009). In any event, we have held it is "self-evident" that a nonprofit corporation incorporated by private actors is not "a department or administrative arm of the government."Highview , 590 F.2d at 176.

We consider caselaw applying both exemptions because the statutory language is the same. StarTran , 608 F.3d at 323 n.14 (citing Brock v. Chi. Zoological Soc'y. , 820 F.2d 909, 910 (7th Cir. 1987) ).

We also note that not all of the additional factors point in favor of Voices being a political subdivision. Unlike the utility district in Hawkins County , Voices does not have eminent domain power.